IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-77

No. 276A20

Filed 18 June 2021

IN THE MATTER OF: T.A.M., K.R.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 9 March 2020 by Judge Susan M. Dotson-Smith in District Court, Buncombe County. This matter was calendared for argument in the Supreme Court on 19 March 2021 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Hanna Frost Honeycutt for petitioner-appellee Buncombe County Department of Social Services; and William A. Blancato for respondent-appellee Guardian ad Litem.*

*Edward Eldred for respondent-appellant father.*

*Peter Wood for respondent-appellant mother.*

BARRINGER, Justice.

¶ 1   Respondent-mother Lauren S. and respondent-father Wesley M. appeal from orders entered by the trial court terminating their parental rights in their minor children T.A.M. and K.R.M.[1] Respondent-father challenges the trial court's decision to grant his appointed counsel's motion to withdraw whereas respondent-mother

---

[1] T.A.M. and K.R.M. will be referred to throughout the remainder of this opinion as "Tam" and "Kam," which are pseudonyms that are used to protect the identities of the juveniles and for ease of reading.

challenges the trial court's determination that it was in Tam and Kam's best interests to terminate her parental rights. Since we conclude that the trial court did not abuse its discretion in any issue raised by the parents' appeals, we affirm the trial court's termination-of-parental-rights orders.

## I. Factual Background

On 15 August 2016, the Buncombe County Department of Social Services (DSS) received a pair of child protective services (CPS) reports alleging that respondent-mother had just given birth to Tam, that she had been using drugs during her pregnancy, and that she had been homeless and living in her automobile immediately prior to giving birth. In addition, the reports alleged that both parents had a history of substance abuse and domestic violence and had recently been arrested on drug-related charges. On 17 August 2016, DSS received another CPS report that restated the allegations contained in the prior report and asserted that respondent-mother suffered from untreated mental health problems, that respondent-father was consuming illegal substances, and that respondent-mother had previously lost custody of another child as the result of substance abuse problems.

A social worker assigned to investigate these reports learned from the staff of the hospital at which respondent-mother gave birth to Tam that respondent-mother had tested positive for THC and unprescribed Oxycodone, and that Tam's cord

toxicology screen had been positive for the presence of marijuana and opiates. In addition, the hospital staff told the social worker that respondent-mother tested positive for methamphetamine in June 2016. Respondent-mother admitted that she had been smoking marijuana during her pregnancy, that she suffered from mental health problems, and that she was diagnosed with borderline personality disorder. However, respondent-mother denied that she had consumed other unlawful substances or had been involved in incidents of domestic violence with respondent-father.

¶ 4        Respondent-father, on the other hand, denied all the allegations that had been made in the CPS reports. Finally, the social worker interviewed another social worker who had worked with the parents at an earlier time. The previous social worker confirmed that she had seen bruises that respondent-father inflicted upon respondent-mother on more than one occasion; that neither parent satisfied the requirements set out in their case plans, which required them to complete substance abuse treatment, mental health treatment, and domestic violence classes; and that respondent-mother acknowledged a history of domestic violence that respondent-father perpetrated against her.

¶ 5        After Tam was placed in a safety care placement, the parents agreed to comply with a safety plan, which required them to participate in supervised visitation; obtain substance abuse treatment; have no contact with each other in Tam's presence; and

consent to follow-up medical care, the assistance of a home health nurse, and the provision of pediatric care for Tam. In addition, respondent-father agreed to complete an anger management program.

¶ 6 According to a substance abuse assessment that respondent-mother obtained, respondent-mother had a severe substance abuse problem, with the assessing agency recommending that respondent-mother participate in therapy due to her "lack of desire or capacity to get clean." The assessing agency also recommended that respondent-mother undergo intensive outpatient therapy and participate in parenting education and domestic violence classes. Furthermore, the assessing agency concluded that respondent-mother had significant mental health problems that hindered her ability to care for a child and diagnosed respondent-mother as being bipolar and suffering from borderline personality disorder, severe opiate use disorder, and moderate cannabis use disorder.

¶ 7 After the completion of this assessment, respondent-mother agreed to enter into a family services agreement pursuant to which she was required to comply with the recommendations made by the assessing agency, to refrain from consuming any medications not prescribed for her, to attend weekly Narcotics Anonymous meetings, and to submit to random drug screens. Similarly, respondent-father agreed to enter into a family services agreement, which required him to attend substance abuse classes, refrain from consuming unlawful substances, submit to random drug screens,

complete a batterer's intervention program, and attend anger management classes. After entering into these family services agreements, respondent-mother was arrested on drug-related charges while respondent-father admitted that he had consumed marijuana and failed to start participating in the batterer's intervention program. As a result, DSS filed a petition alleging that Tam was a neglected juvenile on 22 September 2016.[2]

¶ 8    After an adjudicatory hearing held on 18 November 2016, the trial court entered an order on 5 January 2017 finding that Tam was a neglected juvenile based upon the parents' stipulation as to the accuracy of the allegations contained in the juvenile petition. In view of the parents' further stipulation to the continuance of this case for disposition until a later time, the trial court entered an interim disposition order. This order provided that, while the parents retained custody of Tam, Tam would continue to reside in her safety placement and both parents would be awarded supervised visitation with her.

¶ 9    Following an initial dispositional hearing held on 31 January 2017, the trial court entered an order on 20 February 2017 in which it found as a fact that (1) the parents failed to submit to required drug screens on 19 December 2016; (2) the parents continued to deny that their relationship was characterized by domestic

_____

[2] As a result of the fact that Tam was living in a safety placement, DSS did not take her into nonsecure custody.

violence and minimized the extent to which domestic violence had occurred between them; and (3) the parents continued to reside with each other and lacked sufficiently stable housing to permit them to assume responsibility for providing care for Tam. Moreover, the trial court found that respondent-mother (1) had been arrested on the basis of outstanding warrants on 22 November 2016, and (2) had yet to complete a psychiatric evaluation or participate in medication management, although she had attended substance abuse treatment group sessions.

¶ 10    The trial court further found that respondent-father was completing some aspects of his case plan, such as complying with the terms of his probation, but the trial court also found that he had not been attending his substance abuse group, he was not participating in individual therapy, and he had not yet obtained a medical evaluation. As a result, and with the parents' consent, the trial court placed Tam in DSS custody, provided for supervised visitation between the parents and Tam, and ordered the parents to comply with the provisions of their case plans. After a permanency planning review hearing held on 6 December 2017, the trial court entered an order on 8 January 2018 establishing reunification as the primary permanent plan for Tam, with a secondary permanent plan of custody.

¶ 11    On 12 January 2018, DSS received a CPS report indicating that respondent-mother had recently given birth to Kam. According to the report, respondent-mother admitted to having used marijuana while she was pregnant with Kam and tested

positive for the presence of marijuana in September and December 2017. In addition, the report indicated that respondent-father tested positive for the presence of methamphetamine, cocaine, and marijuana in June 2017. A social worker assigned to investigate the report confirmed the validity of these allegations, with respondent-father having admitted that he had continued to use marijuana and had smoked marijuana on the day prior to his conversation with the investigating social worker.

On 16 January 2018, DSS filed a petition alleging that Kam was a neglected juvenile in which DSS recited the allegations set out in the earlier petition relating to Tam, the history of DSS's efforts to work with the parents, and the information contained in the most recent CPS report. In addition, DSS alleged that the respondent-parents had threatened to sue DSS and that, after learning that Kam would not be discharged to their care, their "behaviors continued to escalate," with respondent-mother having "grabbed" Kam, necessitating the assistance of hospital security personnel. Based upon the same concerns, DSS obtained the entry of an order allowing DSS to take Kam into nonsecure custody.

On 30 January 2018, the trial court held a permanency planning and review hearing regarding Tam. In an order entered on 22 February 2018, the trial court found that the conditions that had led to Tam's removal from the parents' custody continued to exist and that a return to their home would be contrary to Tam's health and safety. In light of that determination, the trial court changed Tam's secondary

permanent plan to adoption while leaving reunification as Tam's primary permanent plan.

¶ 14        An adjudicatory hearing relating to the juvenile petition concerning Kam was held on 16 March 2018. After the parents stipulated to the validity of the allegations in the DSS petitions, the trial court entered an order on 2 April 2018 determining that Kam was a neglected juvenile. Since the parents consented to a continuance of the required dispositional hearing, the trial court entered an interim disposition order providing that Kam would remain in the custody of DSS; that the parents would continue to have supervised visitation; and that the parents should continue to submit to random drug screens, attend counseling, and complete the other services that had been recommended for them.

¶ 15        On 6 June 2018, permanency planning and review hearings were held with respect to both juveniles. In orders entered on 23 July 2018, the trial court noted that the parents had maintained sobriety and sanctioned unsupervised visitation between the parents and Tam and Kam. In addition, the trial court established a primary permanent plan for Kam of reunification with a secondary permanent plan of adoption. In orders entered on 24 September 2018, however, the trial court suspended the parents' unsupervised visitation with the children and made their visitation supervised after the parents failed to satisfy the requirements of their case plans, such as inconsistencies in their attendance at various therapeutic activities and their

eviction from their home.

¶ 16    On 24 January 2019, the trial court entered permanency planning and review orders for both juveniles after a hearing held on 9 January 2019. In that order, the trial court found that the parents had been "doing well with their case plans and visitation with [Tam and Kam] until October 2018 when [DSS] learned of continued substance abuse issues and domestic violence between the respondent parents." Furthermore, the trial court found that respondent-mother was not currently engaged in treatment or therapy of any kind and that respondent-father was not consistently engaged to satisfy the requirements of his case plan. Finally, the trial court noted that DSS had reported that respondent-mother had threatened DSS employees and that DSS was no longer comfortable supervising parental visits with the children except during normal business hours, when law enforcement assistance would be available. As a result, the trial court entered orders changing the permanent plans for both Tam and Kam to a primary plan of adoption, with a secondary permanent plan of guardianship and a tertiary permanent plan of reunification.

¶ 17    On 26 February 2019, DSS filed petitions in which it sought to terminate the parental rights of both parents pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (3). As a result of the fact that respondent-father's whereabouts were unknown at the time that the termination petitions were filed, DSS served him by publication. On 15 May 2019, respondent-father's attorney moved to withdraw from his representation of

respondent-father in light of respondent-father's failure to maintain contact with her. The trial court granted the attorney's motion to withdraw at a continuance hearing held on 22 May 2019 and by an order entered on 7 June 2019. On 4 October 2019, respondent-father appeared before the trial court and the same counsel was re-appointed to represent him. On 22 January 2020, respondent-father's counsel filed another withdrawal motion predicated upon respondent-father's failure to maintain contact with his attorney coupled with the attorney's lack of knowledge concerning respondent-father's wishes and her resulting inability to properly represent respondent-father at the termination hearing.

¶ 18        The DSS termination petitions were heard on 30 and 31 January 2020. On 9 March 2020, the trial court entered orders determining that respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). Respondent-father's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (3). In addition, the trial court concluded that the termination of the parents' parental rights would be in the children's best interests. As a result, the trial court terminated both parents' parental rights in the children. The parents appealed to this Court from the trial court's termination orders.

## II.   Substantive Legal Issues

### A.  Respondent-Father's Appeal

¶ 19        In his sole challenge to the trial court's termination orders, respondent-father argues that the trial court erred by allowing his counsel to withdraw from representing him at the termination hearing. After a careful review of the record, we conclude that the trial court did not abuse its discretion in granting respondent-father's appointed counsel's motion to withdraw.

¶ 20        A trial court's decision to grant or deny an attorney's motion to withdraw is reviewed on appeal for an abuse of discretion. *See Benton v. Mintz*, 97 N.C. App. 583, 587 (1990). "An '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *In re T.L.H.*, 368 N.C. 101, 107 (2015) (alteration in original) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)); *see also White v. White*, 312 N.C. 770, 777 (1985) ("A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision."). Thus, when appellate courts review for abuse of discretion, the inquiry is whether the ruling is unreachable by a reasoned decision, *see White*, 312 N.C. at 777, which necessarily requires appellate courts to consider broadly the circumstances which may render the ruling justifiable, *see In re K.M.W.*, 376 N.C. 195, 217 (2020) (Morgan, J., dissenting) (recognizing that a trial court's assessment of a motion to withdraw, even when involving a statutory right to counsel in a termination of parental rights proceeding, should not be reviewed

"in a vacuum," but should include the "circumstances *surrounding* the termination of parental rights hearing.").

Here, the trial court allowed respondent-father numerous opportunities to participate in the termination-of-parental-rights proceedings, protected respondent-father's statutory right to appointed counsel, and acted well within its discretion to grant respondent-father's attorney's motion to withdraw.

The trial court first advised respondent-father of his responsibility to attend all trial court hearings and maintain communication with his court appointed attorney at the first appearance hearing on DSS's juvenile petition of neglect for Tam held on 11 October 2016.[3] Furthermore, the trial court advised respondent-father that if he failed to attend trial court hearings or failed to maintain communication with his attorney, his attorney "may ask and be permitted to withdraw as his attorney of record, and the case may proceed without him being represented by an attorney."

Following DSS's filing of the termination-of-parental-rights petition on 26 February 2019, DSS made diligent efforts to locate respondent-father. In DSS's affidavit of due diligence filed on 27 February 2019, DSS stated that it had made

---

[3] Again, in an order entered on 23 February 2018, the trial court documented that on 16 January 2018 at the first appearance hearing on DSS's nonsecure custody order for Kam, it had advised respondent-father a second time that it was "his responsibility to maintain contact with his appointed attorney and . . . to attend all [trial c]ourt hearings." The trial court also advised respondent-father that if he did not maintain communication with his attorney or attend all trial court hearings, his attorney may "be permitted to withdraw . . . and the case may proceed without him being represented by an attorney."

unsuccessful efforts to locate respondent-father at four previous addresses, that DSS had spoken with respondent-father and he stated that he could not provide his current whereabouts, that respondent-father did not answer any of DSS's phone calls, that respondent-father was "actively attempting to conceal his residence from [DSS]," that respondent-father indicated that he did not want to receive mail, and that respondent-father's whereabouts could not be ascertained. Respondent-father then failed to appear at the first appearance hearing on the termination-of-parental-rights petition held on 19 March 2019. The trial court found as a fact that respondent-father's whereabouts were still unknown despite diligent efforts by DSS to locate him and ordered DSS to perfect service via publication pursuant to N.C.G.S. § 1-75.10(2), which DSS did on 8 May 2019. Sensitive to respondent-father's statutory right to counsel, the trial court also ordered that respondent-father's appointed-attorney from DSS's juvenile neglect proceeding remain as the provisional court appointed attorney. *See* N.C.G.S. § 7B-602(a) (2019).

¶ 24        Shortly thereafter, respondent-father's appointed attorney filed a motion to withdraw as counsel on 15 May 2019. In her motion to withdraw, respondent-father's attorney stated that she could no longer represent him due to his failure to maintain contact and indicated that the trial court only appointed her as provisional counsel for the termination-of-parental-rights action because respondent-father had not appeared at the first appearance hearing. *See* N.C.G.S. § 7B-1101.1(a)(1). At the

continuance hearing for the termination-of-parental-rights petition held on 22 May 2019, the trial court granted respondent-father's attorney's motion to withdraw. Respondent-father was not present. After respondent-father's counsel was permitted to withdraw, respondent-father missed the subsequent continuance hearing for the termination-of-parental-rights petition held on 20 August 2019.

¶ 25　　The trial court again appointed counsel for respondent-father when he appeared at the 4 October 2019 continuance hearing for the termination-of-parental-rights petition, the same attorney who had previously represented respondent-father, but who had been granted leave to withdraw as counsel only five months earlier due to respondent-father's failure to maintain contact. The trial court advised respondent-father for a third time that it was "his responsibility to maintain contact with his appointed attorney and . . . to attend all [trial c]ourt hearings" and that if he failed to communicate or attend all trial court hearings, his attorney "may ask and be permitted to withdraw as his attorney of record, and the case may proceed without him being represented by an attorney."

¶ 26　　On 22 January 2020, respondent-father's appointed counsel again filed a motion to withdraw as counsel stating that due to respondent-father's failure to communicate, she was unable to know respondent-father's wishes and represent him. Respondent-father's appointed counsel made a good faith effort to serve the motion on respondent-father, notwithstanding his actively attempting to conceal his

residence and his statement to DSS that he did not want to receive mail. A notice of hearing was also filed with the motion, attempting to give respondent-father notice that the motion to withdraw would be heard 30 January 2020 at 9:00 a.m.

¶ 27 Respondent-father then failed to appear at the termination-of-parental-rights hearing held on 30 and 31 January 2020. As a pre-hearing matter on 30 January 2020, the trial court addressed the motion to withdraw filed by respondent-father's attorney, engaging in a colloquy with respondent-father's attorney. Counsel for respondent-father informed the trial court that she had spoken to respondent-father that day and informed respondent-father that if he did not appear at the termination-of-parental-rights hearing, she "would need to withdraw and the case would proceed in his absence." The attorney also stated that respondent-father did not object to his attorney's withdrawal as counsel. The trial court then granted respondent-father's attorney's motion to withdraw.

¶ 28 In relying on *K.M.W.*, the dissent asserts that the majority does not acknowledge that the trial court's discretion only comes into play when the parent has been provided adequate notice of counsel's intent to seek leave of court to withdraw and the trial court has adequately inquired into the basis for counsel's withdrawal motion. 376 N.C. at 211. The dissent erroneously assumes that these circumstances do not exist in this case when in fact they do, as evidenced by the information on the record in the colloquy on the day of the termination-of-parental-

rights hearing, wherein the respondent-father's counsel voluntarily provided a thorough explanation of the circumstances to the trial court and responded to the trial court's sufficient inquiries.

¶ 29        Thus, the trial court acted well within its discretion when it granted respondent-father's appointed attorney's second motion to withdraw. The trial court advised respondent-father on three separate occasions that it was his responsibility to maintain contact with his attorney and attend all trial court hearings. The trial court ensured respondent-father was served by publication even though he concealed his whereabouts from DSS. Despite respondent-father's whereabouts being unknown, the trial court ordered respondent-father's appointed attorney from DSS's juvenile neglect proceeding to remain as his provisional court appointed attorney. The trial court reappointed counsel when respondent-father appeared at the 4 October 2019 continuance hearing, despite his absence from the first appearance hearing on the termination-of-parental-rights petition. The trial court also granted both of respondent-father's motions to continue.

¶ 30        The dissent contends that the majority ignores the principle of *stare decisis* in its view of *K.M.W.* by adopting the *K.M.W.* dissent's perspective. However, such cases as these are fact-specific and hence dependent on the unique facts of any given case. Respondent-father's conduct is distinguishable in the present case from respondent's conduct in *K.M.W.* and, when coupled with the respective counsel's execution of their

responsibilities and the respective trial courts' responses to the unique circumstances, the two cases and their respective outcomes are appropriately distinguishable as well. For example, in *K.M.W.*, the respondent did appear at the termination-of-parental-rights hearing, thereby giving the trial court the opportunity to observe the statutory requirements of N.C.G.S. § 7B-1101.1(a1) (2019), and thus determine if respondent knowingly and voluntarily *waived* her statutory right to counsel. 376 N.C. at 201–02, 210. Here, respondent-father made no apparent effort to observe the trial court's advisements to attend hearings, admitted he did not want to receive mail from DSS or other interested parties, and verbally consented to his attorney's *withdrawal* as counsel. Therefore, we decline to extend *K.M.W.* to the facts before us.

¶ 31    If the holding of *K.M.W.* controlled this case, the result would cause further burdens on our already overburdened trial courts by imposing additional and unnecessary procedures regarding termination-of-parental-rights hearings. A parent, by repeatedly failing to communicate with appointed counsel, by failing to attend numerous hearings, and by admittedly avoiding receiving mail and other communications from DSS and other interested parties, could successfully manipulate the judicial system to seriously delay the termination of parental rights proceeding. Under *K.M.W.*, the trial court would be required to halt a termination-of-parental-rights hearing, track down a parent, ensure the motion to withdraw was

properly served and inquire into the efforts made by counsel to contact the parent, all before allowing counsel to withdraw from representation. 376 N.C. at 210−11. And under these facts, trial courts would be obliged to re-appoint counsel for it all to begin again. These extensive and burdensome processes would impair judicial efficiency and drain already scarce judicial resources, while thwarting the over-arching North Carolina policy to find permanency for the juvenile at the earliest possible age. *See* N.C.G.S. § 7B-1100(2).

¶ 32    The trial court's actions respected the sanctity of respondent-father's statutory right to counsel, giving respondent-father every reasonable opportunity to participate in the termination-of-parental-rights proceeding and to be represented by appointed counsel. The trial court ensured that respondent-father had knowledge of his responsibility to communicate with counsel to enable him to retain representation. All the while, the trial court reasonably balanced and honored the purpose and policy of this State to promote finding permanency for the juvenile at the earliest possible age and to put the best interest of the juvenile first where there is a conflict with those of a parent. *See* N.C.G.S. § 7B-1100(2)−(3) (2019). Therefore, we conclude that the trial court did not abuse its discretion when it granted respondent-father's attorney's motion to withdraw.

**B. Respondent-Mother's Appeal**

¶ 33    Respondent-mother argues that the trial court abused its discretion by

determining that terminating her parental rights would be in the children's best interests. A careful review of the record satisfies us that respondent-mother's argument lacks merit.

¶ 34    The termination of parental rights is a two-stage process consisting of an adjudicatory stage and a dispositional stage. *See* N.C.G.S. §§ 7B-1109 to -1110 (2019). If, during the adjudicatory stage, the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), the trial court proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" after considering the following criteria:

> (1)  The age of the juvenile.
>
> (2)  The likelihood of adoption of the juvenile.
>
> (3)  Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)  The bond between the juvenile and the parent.
>
> (5)  The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)  Any relevant consideration.

N.C.G.S. § 7B-1110(a).

¶ 35    "We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence." *In re J.J.B.*, 374 N.C. 787, 793 (2020).

"The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6 (2019). "An '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *In re T.L.H.*, 368 N.C. at 107 (alteration in original) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

¶ 36     Respondent-mother challenges the following dispositional findings of fact:

> 9.   The minor child[ren][4] ha[ve] little bond with the respondent mother.
>
> . . . .
>
> 11. The respondent mother's relationship with the minor child[ren] is similar to that of a babysitter or family friend.
>
> 12. Respondent mother has failed to address her mental health needs and that impacts her visits. Respondent mother has been unable to be on time consistently to visitation.
>
> 13. Respondent mother has been unable to control her emotions at times during visitation requiring redirection.
>
> . . . .
>
> 15. The children are manifesting behaviors after visitation which show a negative impact of visitation upon them, including nightmares and aggressive behavior [by Tam].

---

[4] "Minor child" is amended to read "minor children" since the trial court entered separate termination-of-parental-rights orders as to Tam and Kam and respondent-mother challenges the same findings of fact in each order. The findings of fact use the same language in each of the termination orders.

> . . . .

> 17. Exposure of the minor child[ren] to respondent parents['] continued relapses would not be in the best interest[s] of the minor child[ren].

As an initial matter, respondent-mother argues that several of the trial court's dispositional findings lack sufficient record support. First, respondent-mother argues that the record fails to support Finding of Fact Nos. 9 and 11. However, Finding of Fact Nos. 9 and 11 are supported by the testimony of a foster care social worker, who described the bond between respondent-mother and the juveniles as follows:

> They know their mom. Her visits have been more consistent. It is not a bond like they have with the foster parents. They do recognize mom. When they visit with mom they, you know, she does engage with them; they engage with her, but there are times that the kids will lean more towards the visitation coach or whoever is supervising that visit for assistance, like maybe with a diaper change or if they want a specific toy or something like that, they often will go to the visitation coach for those rather than mom.

In addition, the social worker agreed that the relationship between respondent-mother and the juveniles was more like that between a child and a friend or other relative than like that between a child and his or her parent. Finally, the guardian ad litem's report, which was admitted into evidence at the termination hearing, described the bond between respondent-mother and the juveniles as

"nonexistent." As a result, we hold that the record contains ample support for Finding of Fact Nos. 9 and 11.

¶ 39     Secondly, respondent-mother contends that the visitation logs that were introduced into evidence at the termination hearing fail to support the trial court's statement in Finding of Fact No. 12. Since the visitation logs reflect that respondent-mother was unable to attend certain scheduled visits and arrived late on numerous occasions, we hold that respondent-mother's challenge to Finding of Fact No. 12 lacks merit.

¶ 40     Thirdly, respondent-mother argues that the visitation logs, which reflect that the visitation coach gave her "high marks on her interactions with Kam and Tam," conflict with Finding of Fact No. 13. However, the Visitation Observation Form relating to the 18 January 2019 visit reflects that, after respondent-mother spoke about "issues with work and family," the visitation coach had to redirect respondent-mother's attention to the juveniles and to ask respondent-mother to interact appropriately and positively with the children. According to the visitation coach, respondent-mother "seemed more focused on what was going on in her life" and "continued to talk about her own stressful situations during [the] visit," leading the visitation coach to urge respondent-mother "not to talk about her own issues."

¶ 41     Similarly, the visitation coach noted on 17 May 2019 that, while respondent-mother was "responsive and playful" at some points during the visit, at other times

respondent-mother "became angry and depressed" and stated, "I just wish I would die, I just don't want to be here anymore." The visitation coach stated that, rather than engaging respondent-mother about her concerns, she asked respondent-mother to focus upon the needs of the children. As a result, Finding of Fact No. 13, is supported by competent evidence.

¶ 42     Respondent-mother also argues that the record does not support the trial court's Finding of Fact No. 15. The record is replete, however, with evidence supporting this component of the trial court's findings. As an initial matter, we note that the guardian ad litem stated in her report that Tam "has always been very clingy after visitation, then she started becoming angry. She would kick, bite, and hit after coming home. Now she comes home afraid, wanting to be held and having nightmares." In addition, the foster care social worker testified that, following their visits with the parents, "[t]he kids have been known to bang their head against the wall" and display "tantrum kind of behaviors." As a result, the record contains ample support for the challenged portion of Finding of Fact No. 15.

¶ 43     Furthermore, respondent-mother argues that the trial court's Finding of Fact No. 17 lacks sufficient support in the record. Once again, we disagree with respondent-mother's contention. The children came into DSS care due, at least in part, to respondent-mother's substance abuse. In support of its termination of respondent-mother's parental rights, the trial court found that respondent-mother

had continued to use unlawful controlled substances such as methamphetamine, cocaine, and marijuana, while the children were in foster care. In addition, as we have previously noted, the record contains ample evidence tending to show that the children engaged in troubling behaviors following their visits with respondent-mother. Thus, we conclude the trial court did not err in making the challenged portion of Finding of Fact No. 17.

¶ 44        Next, respondent-mother contends that she had a strong bond with the children and that, even though that bond was not parental in nature, the trial court erred by effectively requiring her to have such a bond with the children as a precondition for avoiding the termination of her parental rights. According to respondent-mother, the trial court's decision to criticize her bond with the children as not "being parental enough was disingenuous" given that she had few opportunities to act in a parental manner during her visits with the children. Respondent-mother claims that she "should not be penalized for separation from her children when evaluating parental skills" because she "did not have a reasonable opportunity to be [parental with the juveniles]." We are not persuaded by this argument.

¶ 45        The initial defect in respondent-mother's argument is that, as we have already noted, the trial court found, with proper evidentiary support, that respondent-mother had "little bond" with the juveniles. Moreover, we agree with DSS and the guardian

ad litem that respondent-mother's limited opportunity to play a parental role in the children's lives while they were in foster care stemmed, at least in part, from her own relapses into substance abuse, the fact that she was often late for visits, and her inability to control her emotions during those visits. For these and other reasons, we cannot agree with respondent-mother's contention that she bore no responsibility for the lack of bond with her children. Finally, the record fails to support respondent-mother's claim that the trial court required her to show that she had a "parental bond" with the children as a precondition for avoiding the termination of her parental rights. As a result, we hold that the trial court did not commit any error of law in evaluating the nature and extent of respondent-mother's bond with the children as required by N.C.G.S. § 7B-1110(a)(4).[5]

¶ 46    Next, respondent-mother contends that the trial court erred by failing to consider other dispositional alternatives, such as guardianship or placement with a relative or some other suitable person. We addressed a similar argument in *In re Z.L.W.*, 372 N.C. 432, 438 (2019), in which the respondent-father argued that, "given the strong bond between him and" his children, "the trial court should have considered other dispositional alternatives, such as granting guardianship or custody

---

[5] As an aside, we reiterate our prior determination that "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. 432, 437 (2019).

to the foster family, thereby leaving a legal avenue by which [the children] could maintain a relationship with their father." In rejecting this argument, we stated that:

> [w]hile the stated policy of the Juvenile Code is to prevent "the unnecessary or inappropriate separation of juveniles from their parents," N.C.G.S. § 7B-100(4) (2017), we note that "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a *safe, permanent home within a reasonable amount of time,*" *id.* § 7B-100(5) (2017) (emphasis added); *see also In re Montgomery*, 311 N.C. at 109 (emphasizing that "the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star").

*Id.* at 438 (alteration in original). Consequently, we held the trial court did not abuse its discretion by determining that termination, rather than guardianship or custody with a foster family, would be in the children's best interests. *Id.*

¶ 47        Similarly, in this case, the trial court's findings of fact demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. 88, 101 (2020). As a result, "[b]ecause the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors," *id.*, we conclude the trial court did not abuse its discretion by concluding that termination, rather than guardianship or custody, would be in Tam's and Kam's best interests.

¶ 48      Finally, respondent-mother argues that the trial court abused its discretion by terminating her parental rights because, while returning custody of the juveniles to her would not be in their best interests, allowing them to maintain a relationship through continued visitation was in the juveniles' best interests. Respondent-mother again cites the bond she had with the juveniles and claims they enjoyed their visits. However, the trial court found in unchallenged Findings of Fact Nos. 18, 19, and 20 that the children's permanent plan included adoption, that the likelihood that they would be adopted was high, and that terminating respondent-mother's parental rights was necessary to accomplish the permanent plan for the children. In addition, we have already concluded that the trial court's dispositional findings regarding her visitation and lack of a parental bond with the juveniles was supported by competent evidence. As a result, we hold that respondent-mother's final argument lacks merit and that the trial court did not abuse its discretion in determining that terminating respondent-mother's parental rights was in the children's best interests.

## III.    Conclusion

¶ 49      Thus, for the reasons set forth above, we hold that the trial court did not abuse its discretion in granting respondent-father's counsel's motion to withdraw and the trial court did not abuse its discretion by determining that the termination of respondent-mother's parental rights was in the children's best interests. Accordingly, the trial court's termination-of-parental-rights orders are affirmed.

AFFIRMED.

Justice ERVIN, concurring, in part, and dissenting, in part.

Although I concur with my colleagues' determination that the trial court's decision to terminate respondent-mother's parental rights should be affirmed, I am unable to agree with their decision to uphold the termination of respondent-father's parental rights and respectfully dissent from their decision to do so. Simply put, after carefully reviewing the record in light of recent, and clearly controlling, precedent from this Court, I feel compelled to conclude that the trial court erred by allowing respondent-father's trial counsel to withdraw from her representation of respondent-father without ensuring that proper notice had been provided to respondent-father and without conducting a sufficient inquiry into either the reasons for the requested withdrawal or the extent to which respondent-father understood the implications of his counsel's request. As a result, I concur in the Court's decision, in part, and dissent from that decision, in part.

At the outset of the termination hearing which occurred on 30 and 31 January 2020, the following proceedings occurred:

> [DSS ATTORNEY]: Mr. Sheriff, if you could call out [respondent-father].
>
> THE COURT: Sheriff, if you would please call out [respondent-father].
>
> (Bailiff called out [respondent-father] to appear in court.)
>
> THE COURT: Thank you. He does not appear present. You'd like to rest on your Motion To Withdraw?

[FATHER'S COUNSEL]: Your Honor, I would like to tell the Court so it will be -- and I probably, if Your Honor can sign that order, but I want to draft a more comprehensive order that includes the findings of fact of what's happened today. I spoke to him. I explained that if he wasn't here at 2:00 p.m. I would need to withdraw and the case would proceed in his absence.

THE COURT: So you spoke to him today?

[FATHER'S COUNSEL]: Correct, like very briefly a short time ago. He understands that we've not spoken substantively about the case and if he doesn't show up today I need to proceed on the Motion To Withdraw and he does not object to that.

THE COURT: All right. I will grant your motion but I'll hold it for a proper order to withdraw. If I sign this one I don't want to have to do an amended so --

[FATHER'S COUNSEL]: Okay.

THE COURT: -- I want to get something more fully but I'll go ahead and grant that motion at this time.

[FATHER'S COUNSEL]: I'll bring that tomorrow.

. . . .

THE COURT: So let me put it to you this way, [counsel]. I don't want to stop not going through to this afternoon's case and so I'm more inclined to write in my own little bits on this order and let that count and that way I can give it to you right now and we'll be ready to go; okay?

[FATHER'S COUNSEL]: Yes, ma'am.

THE COURT: All right. I'm just going to do it right now. Thank you.

[FATHER'S COUNSEL]: Your Honor, the main thing I wanted in it is that I had explained to the client that if he

> didn't show up today I would withdraw and they would proceed in his absence and that he did not object to that motion.

In a subsequent written order granting respondent-father's attorney's withdrawal motion, the trial court found that:

> [R]espondent-father has been in contact [with his attorney], but provided no direction or substance. [Respondent-father was] given [the opportunity] to show up in [court for the morning and afternoon] sessions, and opted to communicate no objection to [his counsel's] withdrawal. [Respondent-father] was aware of [the hearing to terminate his parental rights] and of [the] hearing on [the] motion to withdraw.

¶ 52 "A parent whose rights are considered in a termination of parental rights proceeding must be provided with fundamentally fair procedures consistent with the Due Process Clause of the Fourteenth Amendment." *In re J.E.B.*, 376 N.C. 629, 2021-NCSC-2 (cleaned up). "In order to adequately protect a parent's due process rights in a termination of parental rights proceeding, the General Assembly has created a statutory right to counsel for parents involved in termination proceedings." *In re K.M.W.*, 376 N.C. 195, 208 (2020). According to N.C.G.S. § 7B-1101.1(a) (2019), "[t]he parent [in a termination of parental rights proceeding] has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right."

¶ 53 As this Court has previously stated, "[c]onsistently with the provisions of N.C.G.S. § 7B-1101.1(a1), Rule 16 of the General Rules of Practice prohibits an attorney from withdrawing from his or her representation of a client in the absence

of '(1) justifiable cause, (2) reasonable notice to the client, and (3) the permission of the court.'" *In re K.M.W.*, 376 N.C. at 209. "[B]efore allowing an attorney to withdraw or relieving an attorney from any obligation to actively participate in a termination of parental rights proceeding when the parent is absent from a hearing, the trial court must inquire into the efforts made by counsel to contact the parent in order to ensure that the parent's rights are adequately protected." *Id.* at 210.

¶ 54 A trial court's decision to grant or deny an attorney's withdrawal motion is reviewed on appeal using an abuse of discretion standard of review, *id.* at 209, with such an abuse of discretion having occurred only when the trial court's ruling is "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777 (1985). "However, this 'general rule presupposes that an attorney's withdrawal has been properly investigated and authorized by the court,' so that, '[w]here an attorney has given his client no prior notice of an intent to withdraw, the trial judge has no discretion.'" *In re K.M.W.*, 376 N.C. at 209 (quoting *Williams & Michael, P.A. v. Kennamer*, 71 N.C. App. 215, 217 (1984)).

¶ 55 I see no indication, after a careful examination of the record, that respondent-father was served with his attorney's withdrawal motion prior to the hearing. Respondent-father's attorney attempted to serve her withdrawal motion upon her client by mailing it to him at an address at which respondent-father had previously stated that he did not receive mail. Although respondent-father's attorney told the

trial court that she had spoken with her client and informed him that she intended to withdraw in the event that respondent-father failed to appear for the hearing, the attorney described her conversation with respondent-father as brief and indicated that it had occurred shortly before the termination hearing was scheduled to begin. In addition, the record does not reflect that the trial court made any inquiry concerning the nature and extent of the attorney's efforts to serve the withdrawal motion upon respondent-father prior to the date of the hearing or into what efforts the attorney had made to ensure that respondent-father "understood the implications of the action that [counsel] proposed to take or to protect [respondent-father's] statutory right to the assistance of counsel." *Id.* at 211. As a result, I believe that the trial court erred by failing to ensure that respondent-father had received "reasonable notice" of the attorney's withdrawal motion as required by N.C.G.S. § 7B-1101.1(a1) or by our decision in *K.M.W.* before allowing that motion.

¶ 56     In addition, even though respondent-father's counsel informed the trial court at the termination hearing that her client did not object to the allowance of the withdrawal motion, I am not persuaded that any statement that respondent-father might have made to that effect amounted to a waiver of his statutory right to counsel. "Although parents eligible for the appointment of counsel in termination of parental rights proceedings may waive their right to counsel, they are entitled to do so only 'after the court examines the parent and makes findings of fact sufficient to show that

the waiver is knowing and voluntary.' " *Id.* at 209 (quoting N.C.G.S. § 7B-1101.1(a1) (2019)). Aside from the fact that the trial court was unable to make the required inquiry given respondent-father's failure to appear at the termination hearing, I agree with respondent-father that, given that his alleged "consent" to the attorney's withdrawal was obtained, at most, only a few hours before the hearing began and at a time when the record does not show that respondent-father had prior notice of the attorney's intention to withdraw or had been adequately advised about the implications of this action, respondent-father was not provided with sufficient opportunity to make a reasoned decision concerning whether to waive his right to counsel. *Id.* (stating that "a waiver of counsel, generally speaking, requires a knowing and intentional relinquishment of that right").

¶ 57 The Court does not clearly indicate whether its decision to reject respondent-father's challenge to the trial court's termination orders rests upon a determination that respondent-father waived his statutory right to counsel or that respondent-father forfeited that right. To the extent that the Court's decision rests upon forfeiture-related, rather than waiver-related, considerations, I am unable to agree with any such determination. As this Court recently stated:

> in rare circumstances a defendant's actions frustrate the purpose of the right to counsel itself and prevent the trial court from moving the case forward. In such circumstances, a defendant may be deemed to have forfeited the right to counsel because, by his or her own actions, the defendant has totally frustrated that right. If

> one purpose of the right to counsel is to "justify reliance on
> the outcome of the proceeding," then totally frustrating the
> ability of the trial court to reach an outcome thwarts the
> purpose of the right to counsel.

*State v. Simpkins*, 373 N.C. 530, 536 (2020).  In other words,

> [t]he trial court is not required to abide by the directive to
> engage in a colloquy regarding a knowing waiver where the
> litigant has forfeited his right to counsel by engaging in
> actions which totally undermine the purposes of the right
> itself by making representation impossible and seeking to
> prevent a trial from happening at all.  However, a finding
> that a [parent] has forfeited the right to counsel has been
> restricted to situations involving egregious dilatory or
> abusive conduct on the part of the litigant.

*In re K.M.W.*, 376 N.C. at 209 (cleaned up); *see also State v. Blakeney*, 245 N.C. App.

452, 461–62 (2016) (stating that "forfeiture has generally been limited to situations

involving 'severe misconduct' and specifically to cases in which the defendant engaged

in one or more of the following:  (1) flagrant or extended delaying tactics, such as

repeatedly firing a series of attorneys; (2) offensive or abusive behavior, such as

threatening counsel, cursing, spitting, or disrupting proceedings in court; or (3)

refusal to acknowledge the trial court's jurisdiction or participate in the judicial

process, or insistence on nonsensical and nonexistent legal 'rights' ").  Although

respondent-father may have attempted to conceal his whereabouts and avoid service

in the course of this proceeding and although the trial court warned respondent-

father on at least two occasions that he was responsible for maintaining contact with

his appointed counsel and to attend the trial court's hearings, with the potential

consequence of any failure on his part to do so including the withdrawal of his trial counsel and the necessity for him to proceed without the assistance of counsel, I do not believe that respondent-father's conduct, as described in the record, suffices to support a finding that respondent-father had forfeited the right to counsel and my colleagues do not explicitly make an argument to the contrary. While "[t]here is no bright-line definition of the degree of misconduct that would justify forfeiture of a [parent's] right to counsel," *Blakeney*, 245 N.C. App. at 461, a finding of "[f]orfeiture of counsel should[, as the Court of Appeals has stated,] be a court's last resort," *State v. Wray*, 206 N.C. App. 354, 360 (2010). After carefully examining the record, I am unable to agree with the majority that the conduct in which respondent-father engaged in this case constituted conduct that was "so egregious as to justify forfeiture of the right to counsel." *Simpkins,* 373 N.C. at 540.

¶ 58    Aside from its failure to make any mention of the legal principles that control the resolution of issues like those that we have before us in this case, the Court's decision is patently inconsistent with our very recent decision in *K.M.W.*, in which we held that a "very limited inquiry undert[aken] [by the trial court] before allowing [counsel's] withdrawal motion" constituted error and that, "even if the trial court did not err by allowing [the] withdrawal motion, it erred by allowing respondent-mother to represent herself at the termination hearing without making adequate inquiry into

the issue of whether she wished to appear *pro se*." *In re K.M.W.*, 376 N.C. at 211–12.

In reaching the first of these conclusions, we stated that:

> A careful examination of the record that has been presented for our review in this case indicates that neither the certificate of service attached to [trial counsel's] withdrawal motion nor any related correspondence shows that respondent-mother was served with a copy of the withdrawal motion prior to the date upon which [trial counsel] was allowed to withdraw. On the contrary, the certificate of service attached to [trial counsel's] withdrawal motion appears to reflect that the only party upon whom that motion was served was DSS. Although [trial counsel] told the trial court that respondent-mother had "requested" that he withdraw from his representation of her and that he had "attempted to secure [respondent-mother's] presence in court" at the time that his withdrawal motion was heard, the trial court does not appear to have made any inquiry into whether respondent-mother had been served with the withdrawal motion; whether [trial counsel] had informed respondent-mother that he intended to move to withdraw on that date; why respondent-mother had requested [trial counsel] to withdraw, including whether his withdrawal motion resulted from respondent-mother's inability to pay for his services; and what efforts [trial counsel] had made to ensure that respondent-mother understood the implications of the action that he proposed to take or to protect her statutory right to the assistance of counsel. As a result, given the very limited inquiry that the trial court undertook before allowing [trial counsel's] withdrawal motion, we conclude that the trial court erred by allowing that motion.

*Id*. at 211. In addition, we held that,

> even if the trial court did not err by allowing [trial counsel's] withdrawal motion, it erred by allowing respondent-mother to represent herself at the termination

hearing without making adequate inquiry into the issue of whether she wished to appear *pro se*. As the record clearly reflects, the waiver of counsel form that respondent-mother completed at the time that [her original trial counsel] was allowed to withdraw from his representation of respondent-mother in the termination proceeding was intended to facilitate her employment of privately-retained counsel and did not constitute a waiver of her right to any and all counsel. On the contrary, a careful examination of the waiver of counsel form that respondent-mother completed reflects that respondent-mother checked the box relating to a waiver of her right to court-appointed counsel and did not check the box stating that "I do not want the assistance of any lawyer. I understand that I have the right to represent myself, and that is what I intend to do." For that reason, the record amply demonstrates that respondent-mother had generally wished to be represented by counsel, had been represented by counsel in the termination proceeding until the allowance of [trial counsel's] withdrawal motion, and had never expressed the intention of representing herself. In light of that set of circumstances, we believe that the trial court had an obligation to make inquiry of respondent-mother concerning the issue of whether she wished to represent herself at the time that she made her tardy appearance at the termination hearing as required by N.C.G.S. § 7B-1101.1(a1).

*Id*. at 211–12.

¶ 59    Although the facts before the Court in this case are not, of course, completely identical to those at issue in *K.M.W.*, the inquiry that the trial court conducted in this case is not materially different from the one that we found to be insufficient in *K.M.W.* After citing the dissenting opinion that was filed in *K.M.W.* rather than the analysis set out in the majority's decision, my colleagues make a number of fact-based

arguments that misread our earlier decision and rest upon the same sorts of fact-based arguments that we held to be insufficient to support the affirmance of the trial court's order in that case. For example, my colleagues emphasize the fact that DSS made "diligent efforts to locate respondent-father" at earlier points during the history of this proceeding and the fact that respondent-father made it difficult for DSS to locate him. However, aside from the fact that similar difficulties existed in *K.M.W.*, the operative issue for purposes of this case is the extent to which the trial court, at the time that the withdrawal motion was made, conducted an adequate inquiry into the notice that respondent-father had received in advance of his counsel's request for leave to withdraw rather than whether respondent-father had been difficult to deal with earlier in the proceeding. Similarly, although my colleagues state that respondent-father's counsel "made a good faith effort to serve the [withdrawal] motion on respondent-father," they do not point to anything in the record that tends to support this particular assertion and appear to overlook the fact that the record does, as I have already noted, reflect that respondent-father's counsel sent the withdrawal motion to an address at which respondent-father had previously indicated that he did not receive mail. In addition, my colleagues emphasize the fact that respondent-father's counsel talked to respondent-father shortly before the time at which the withdrawal motion was heard and told him that she would seek to withdraw from representing respondent-father despite the fact that a similar set of

facts was addressed and found to be insufficient to support an affirmance in *K.M.W.*
Finally, the Court states that this case is distinguishable from *K.M.W.* because
respondent-father, unlike the respondent-mother in *K.M.W.,* did not attend any part
of the hearing and could not, for that reason, have been questioned about the extent
to which he knowingly and voluntarily waived his right to the assistance of counsel
even though our opinion in *K.M.W.* clearly indicates that the trial court's failure to
question respondent-mother when she arrived in the hearing room was an entirely
separate error from the trial court's failure to conduct an adequate inquiry into the
issue of whether respondent-mother's counsel should have been allowed to withdraw
in the first place. As a result, there are no material differences between the facts in
this case and those that were before us in *K.M.W.*

¶ 60          Finally, although my colleagues are correct in pointing out that the standard
of review that is usually applicable in connection with appellate challenges to the
allowance of withdrawal motions involves an inquiry into the issue of whether the
trial court abused its discretion in allowing counsel to withdraw, they err to the extent
that they treat this standard of review as the only one applicable in this case.
Although the extent to which the trial court erred by allowing respondent-father's
counsel to withdraw would have been subject to review on the basis of an abuse of
discretion standard in the event that an adequate inquiry had been conducted into
the issue of whether respondent-father had been properly notified of his counsel's

request to withdraw, such a standard does not apply when the relevant issue is the extent to which the trial court conducted an adequate inquiry into the notice issue. The difference between the standards of review that apply with respect to these two distinct issues is clearly set out in *K.M.W.*, which my colleagues have, once again, simply failed to follow.

At the end of the day, I am unable to discern how our decision in this case can be squared with basic principles of stare decisis, pursuant to which those who disagree with an earlier decision are expected to continue to adhere to it unless and until it is overruled. *See State v. Straing*, 342 N.C. 623, 627 n.1 (stating that, "[a]lthough the author of this opinion still believes that [a former decision of this Court] was wrongly decided, he is now required by stare decisis to apply that precedent in the case sub judice"); *Hill v. Atlantic & N.C. R. Co.*, 143 N.C. 539, 574 (1906) (stating that "[w]hat our present opinion may be, as to the merits of the decision in [a certain] case, is now of no consequence whatsoever" given that, "[i]n construing statutes, and the Constitution, the rule is almost universal to adhere to the doctrine of stare decisis"). As a result of its failure to adequately explain how the decision that it makes today can be squared with *K.M.W.*, it is difficult to avoid the conclusion that the Court has no basis for failing to rely upon our decision in that case other than the fact that my colleagues disagree with it. Moreover, even though "[t]he doctrine of stare decisis will not be applied . . . to preserve and perpetuate error

and grievous wrong," *State v. Ballance*, 229 N.C. 764, 767 (1949), the Court has not made any attempt to establish how *K.M.W.* works such a "grievous wrong" that we should refuse to give it precedential effect. Such a disregard for precedent risks undermining the stability of North Carolina law.

¶ 62 At a deeper level, my colleagues appear to rest their decision to uphold the termination of respondent-father's parental rights on the basis of concerns that the decision that I believe to be appropriate "would cause further burdens on our already overburdened trial courts by imposing additional and unnecessary procedures regarding termination of parental rights hearings" and "thwart[ ] the over-arching North Carolina policy to find permanency for the juvenile at the earliest possible time." Aside from the fact that the principles that underlie the decision that I believe to be appropriate rest upon statutory provisions, judicial decisions, and portions of the General Rule of Practice that have been in effect for a considerable period of time, the number of reported cases relating to the waiver or forfeiture of counsel in termination cases is relatively small, a fact that suggests that my colleagues' concern for the efficiency with which termination cases will be handled in the future is substantially overstated. Simply put, while I acknowledge the difficulties that our colleagues on the trial bench face every day, the result that I believe to be appropriate in this case is solidly grounded in well-established North Carolina law, cannot be fairly accused of introducing any novelty into our termination of parental rights

jurisprudence, does not involve any sort of extension of *K.M.W.*, and will not impose any undue burden upon our trial courts.

¶ 63        Secondly, and more importantly, the statutory provisions that govern this case are intended to serve a number of policy goals in addition to achieving permanence "within a reasonable amount of time" by placing a child up for adoption. N.C.G.S. § 7B-100(5). Aside from the fact that nothing contained in N.C.G.S. § 7B-100(5) creates any sort of presumption in favor of terminating a parent's parental rights and the fact that the decision to place the burden of proof with respect to the issue of whether grounds for termination exist in a particular case upon the party seeking to achieve that result suggests that the opposite is, in fact true, N.C.G.S. § 7B-1111(b), the relevant provisions of our Juvenile Code are also intended to "assure fairness and equity" and "protect the constitutional rights of juveniles and parents," N.C.G.S. § 7B-100(1), and to "prevent[ ] the unnecessary or inappropriate separation of juveniles from their parents." N.C.G.S. § 7B-100(4). In other words, the policy that is sought to be achieved by means of the relevant statutory provisions, including those providing parents with the right to the assistance of counsel, does not consist of the achievement of a particular result. Instead, the relevant statutory provisions are intended to ensure that all affected parties have an adequate opportunity to be heard with respect to the issue of what is in the best interests of the child. As a result, given that the decision that the Court has reached in this case is inconsistent with

controlling decisions of this Court and rests upon a mistaken view of the proper purpose of a termination of parental rights proceeding, I would hold that, while its termination order should be affirmed with respect to respondent-mother, the trial court erred by allowing respondent-father's trial counsel to withdraw from her representation of respondent-father and that this case should be remanded to the District Court, Buncombe County, for further proceedings not inconsistent with this opinion, including a new termination hearing concerning respondent-father's parental rights.

Justices HUDSON and EARLS join in this concurring and dissenting opinion.